**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILFRED O. ALVAREZ-RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 2601 EDA 2023 |

Appeal from the Judgment of Sentence Entered July 19, 2023
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001365-2022

BEFORE:  BOWES, J., STABILE, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 12, 2025**

Wilfred O. Alvarez-Rodriguez appeals from the aggregate judgment of sentence of six to twelve years of incarceration imposed upon his convictions for conspiracy to commit possession with intent to deliver ("PWID"), possession of drug paraphernalia, and resisting arrest.  We affirm.

Given our disposition, a detailed recitation of the underlying facts of this case need not be included herein.[1]  Briefly, on January 26, 2022, Appellant was the front-seat passenger in a Honda Civic owned by his partner, Yamilez Davila, that was being driven by Jose Delvalle-Melendez on I-76 in Montgomery County.  Pennsylvania State Trooper Joseph Gilbert initiated a traffic stop of the Civic because its windows were so heavily tinted that he

_____

[1] A thorough summary of the underlying facts is provided in the trial court's opinion.  *See* Trial Court Opinion, 6/20/24, at 2-10.

could not see into the vehicle. During the course of the stop, Trooper Gilbert observed or discovered, *inter alia*, the following through conversations with the men and a consensual search of the vehicle: the immediate smell of raw marijuana; nervous behavior by Appellant; information that Melendez had a suspended license, criminal history of drug offenses, and a revoked gun permit; the presence of a burner phone and loose marijuana that was not in a container from an authorized dispensary; a sleeping preschool-aged child in the back seat who was not in a car seat; the inability of either adult to specify or otherwise describe where their drive had originated other than being in Philadelphia; and a black fanny pack, which had initially been in Appellant's lap was emptied and shoved under the front passenger's seat while the trooper had been speaking with Melendez.

After Appellant consented to being searched, Trooper Gilbert detected a large, square package in Appellant's groin area, prompting Appellant to attempt to flee. Trooper Gilbert tackled Appellant to the ground mere inches from the lane of traffic on the Interstate during rush hour. Appellant and Melendez meanwhile began yelling at each other in Spanish and Appellant in English repeatedly accused the driver of having given Appellant the fanny pack and its contents. A search of Appellant's person incident to his arrest produced a plastic bag containing just shy of 200 grams of fentanyl enclosed in other plastic bags.

The Commonwealth charged Appellant with PWID, possession of a controlled substance, possession of paraphernalia, resisting arrest, and conspiracy to commit PWID.[2] Appellant filed an omnibus pretrial motion seeking the suppression of all evidence obtained as a result of Trooper Gilbert prolonging the traffic stop. The trial court denied the motion after conducting a hearing during which it viewed dash cam video of the events and heard testimony from Trooper Gilbert and Trooper James Sparenga, who had joined Trooper Gilbert during the stop.

Trooper Gilbert, Detective Vincent Fuentes, Ms. Davila, and Appellant testified at the subsequent jury trial.[3] Pertinent to this appeal, Ms. Davila testified that she and Appellant were aware of Melendez's participation in illegal drug sales, but that they were not involved with it. She indicated that, on the day in question, Melendez had repeatedly called Appellant and then called her phone when Appellant did not answer. After the men ultimately spoke, Appellant dropped Ms. Davila off at work in her car and went to get Melendez "to pick up some car pieces." N.T. Trial, 5/2/23, at 76. Appellant then video called her in the late afternoon, asked where he could find the vehicle registration, and hung up. She immediately called him back to ask

_____

[2] The Commonwealth later withdrew the simple possession charge.

[3] While Appellant's case was initially consolidated for trial with that of Melendez, after the suppression hearing the court granted Melendez's motion to sever.

- 3 -

what was happening. When Ms. Davila sought to testify about Appellant's statements during the ensuing conversation, the Commonwealth objected to the hearsay and the court sustained the objection. She was permitted to testify that Appellant was nervous and shaking during the FaceTime call, on which she remained for "an hour or two" until the trooper hung up after informing her that the men were being charged with drug trafficking and resisting arrest. *Id*. at 85.

When Appellant took the stand, he informed the jury that as a result of his morning phone conversation, he picked up Melendez, who came out with his little boy and directed Appellant to follow the GPS directions Melendez had queued up on his phone. They ended up in Philadelphia, where Appellant remained in the car with Melendez's son for various amounts of time. After they met up with Melendez's uncle and went to lunch, and Melendez told Appellant he wanted to drive home. About an hour outside of Philadelphia, Melendez noticed that he was being followed by police, took a bag out of his pants, directed Appellant to hide it, and told Appellant that if the police took his son, he would kill Appellant. *Id*. at 118-19. Appellant recounted his FaceTime call to Ms. Davila during the traffic stop and how he told her what had happened before he got out of the car. Appellant maintained that he did not know about the drugs, had no agreement with Melendez to get or sell the drugs, and would not have given Melendez a ride if he had known they were going to get drugs.

During deliberations, the jury asked: (1) to rehear a portion of Ms. Davila's testimony indicating that she and Appellant had been aware prior to the incident in question that Melendez dealt drugs; and (2) a definition of the word intent as used in the PWID charge. *See* N.T. Trial, 5/3/23, at 4-6. The court accommodated both requests, fulfilling the latter by reading the standard jury instruction defining controlled substance possession. *Id*. at 7-10.

After further deliberations, the jury came back with a verdict of not guilty as to PWID, but convicted Appellant of possession of paraphernalia, resisting arrest, and conspiracy to commit PWID. On July 19, 2023, the court imposed a below-mitigated-range sentence of five to ten years of imprisonment for conspiracy, a consecutive, aggravated-range sentence of one to two years for resisting arrest, and no further penalty for the paraphernalia conviction. Appellant filed a timely post-sentence motion seeking reconsideration of his sentence, which he asserted was excessive in light of the circumstances and mitigating factors. The trial court denied the motion after a hearing. This timely appeal followed.

Appellant's privately-retained trial counsel was thereafter permitted to withdraw. The court appointed counsel who timely filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal after obtaining an extension of time. The trial court thereafter prepared a responsive Rule 1925(a) opinion.

Appellant presents the following questions, which we have re-ordered for ease of consideration:

> 1. Whether the trial court erred in denying Appellant's motion to suppress evidence where [he] was subjected to an investigatory detention without reasonable suspicion.
>
> 2. Whether the trial court erred in failing to give a duress jury instruction where the evidence at trial showed that Appellant was pressured into placing the drugs in his pants under threat by [Melendez].
>
> 3. Whether Appellant's sentence was unduly harsh, excessive, unreasonable, an abuse of discretion and contrary to the fundamental norms of the sentencing guidelines and failed to adequately consider Appellant's age, drug addiction, mental health issues and family support.
>
> 4. Whether the trial court erred in prohibiting Appellant's partner, [Ms.] Davila, from testifying what Appellant said to her during a telephone conversation while the Trooper had stopped their vehicle. This conversation would have corroborated Appellant's theory of the case and was admissible as an excited utterance or present sense impression expectations [*sic*] to the rule against hearsay.

Appellant's brief at 9-10 (unnecessary capitalization and articles omitted).

We begin with the standards of review applicable to each of Appellant's first three issues. The following law governs our consideration of his suppression challenge:

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense

as remains uncontradicted.  Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

**Commonwealth v. Singleton**, 169 A.3d 79, 82 (Pa.Super. 2017) (cleaned up).

Appellant's second claim assails the trial court's refusal to instruct the jury as to the defense of duress.[4]  "Our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Yale**, 150 A.3d 979, 983 (Pa.Super. 2016) (cleaned up).

Regarding our review of Appellant's sentencing challenge, we are mindful of the following:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the

_____

[4] The General Assembly has provided that it is a complete defense to a crime if "the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist."  18 Pa.C.S. § 309(a).  However, the defense "is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress."  18 Pa.C.S. § 309(b).  We will not disturb a trial court's determination that the defense is not warranted where the only evidence of duress comes from the defendant himself and leaves no room for reasonable disagreement that he had forgone opportunities to avoid the threatened harm.  **See Commonwealth v. Markman**, 916 A.2d 586, 608 (Pa. 2007) (citing **Commonwealth v. Pelzer**, 612 A.2d 407, 414 (Pa. 1992) (plurality)).

sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation.

*Commonwealth v. Kitchen*, 162 A.3d 1140, 1146 (Pa.Super. 2017) (cleaned up). When the trial court had the benefit of a presentence investigation report, we presumed it considered all the relevant sentencing factors. *See*, *e.g.*, *Commonwealth v. Clemat*, 218 A.3d 944, 960 (Pa.Super. 2019).

After a thorough review of the certified record, the parties' briefs and the pertinent law, we discern no error of law or abuse of discretion on the part of the trial court as to the first three issues raised by Appellant. We therefore affirm the denial of relief on these claims for the reasons stated in the opinion that the Honorable Thomas P. Rogers entered on June 20, 2024.

First, Judge Rogers accurately summarized the law applicable to Appellant's suppression claim that the trooper unlawfully extended the traffic stop. *See* Trial Court Opinion, 6/20/24, at 29-35. The opinion further adequately explained the court's findings, which are supported by the record that: (1) an examination of the totality of the circumstances following the initial stop of the Civic gave rise to a reasonable suspicion that criminal activity was afoot warranting further investigation; (2) Appellant voluntarily

consented to the search of his person during that follow-up investigation; (3) the trooper had probable cause to arrest Appellant when that search detected the package in his groin area and Appellant attempted to flee; and (4) the trooper validly seized the contraband during the ensuing search incident to arrest. *Id*. at 36-41.

Next, the court's explanation of its decision not to instruct the jury as to duress does not evince an abuse of discretion or error of law. *Id*. at 43-47 (opining that Appellant's evidence did not warrant the instruction because his testimony was that Melendez made a vague, conditional threat to kill him, and there was no evidence of a history of violence or intimidation in their relationship).[5] *Cf. Commonwealth v. Markman*, 285, 916 A.2d 586, 607 (Pa. 2007) (holding the instruction was warranted where the appellant's "trial testimony set out at length the basis for her claim of duress, including that [her co-defendant] repeatedly battered her and placed a knife to her throat or side and threatened her with death if she did not do as he instructed").

---

[5] In affirming the court's decision not to give the duress instruction, we also rely upon facts, highlighted by the Commonwealth, that Appellant did not avail himself of ample opportunities to tell Trooper Gilbert of Melendez's threats and that Appellant, who testified that he had viewed Melendez as a good person whom he had intended to make the godfather of his child, did not claim Melendez coerced him into entering the conspiracy in the first place. *See* Commonwealth's brief at 24-27.

Finally, addressing the substance of Appellant's sentencing challenge,[6]

Judge Rogers supported its propriety by discussing how he reviewed and

considered the relevant information, including the presentence report, along

with the following:

> the sentencing guidelines, the letters received in support of
> Appellant, the sentencing statute, the issues of general and
> specific deterrence, the amount of fentanyl recovered from inside
> of Appellant's pants and the danger it posed to thousands of
> people, Appellant's criminal history including prior convictions for
> [PWID] and resisting arrest, his multiple probation and parole
> violations, multiple misconducts while incarcerated, and the
> danger he placed Trooper Gilbert in by resisting arrest next to the
> highway with cars speeding past during rush hour.

Trial Court Opinion, 6/20/24, at 54-55. The court then correctly observed that

Appellant failed to identify how the court's decision to impose an aggregate

sentence that was below the standard guideline range for the conspiracy

conviction alone amounted to a sentence so excessive that it manifested an

abuse of discretion. *Id*. at 55. *See also* N.T. Sentencing, 7/19/23, at 39-44.

_____

[6] Appellant challenged the discretionary aspects of his sentence in his post-sentence motion, and his brief includes a statement pursuant to Pa.R.A.P. 2119(f) wherein he asserts that his claim presents a substantial question that the court violated the sentencing code. *See* Appellant's brief at 33-36. We agree that he has raised a substantial question. *See*, *e.g.*, *Commonwealth v. Caldwell*, 117 A.3d 763, 770 (Pa.Super. 2015) (*en banc*) (observing that a substantial question is presented by "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors").

Appellant's remaining claim is that the trial court erred in prohibiting Ms. Davila from testifying to what Appellant said to her on the phone during the traffic stop. Our standard of review is well-settled:

> The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Ganjeh***, 300 A.3d 1082, 1091 (Pa.Super. 2023) (cleaned up).

Appellant maintains that he should have been permitted to elicit testimony from Ms. Davila that Appellant told her in a FaceTime call that occurred while Trooper Gilbert was questioning Melendez, that Melendez threatened Appellant into taking the drugs. The Commonwealth objected on the basis of hearsay, and Appellant listed prior consistent statement, excited utterance, and present sense impression as exceptions to the rule against hearsay that rendered the out-of-court statements admissible.[7] The court

_____

[7] In this vein, our Rules of Evidence provide that a witness's prior consistent statement is admissible to rehabilitate the witness's credibility following, *inter alia*, impeachment with a prior inconsistent statement or a suggestion of fabrication. ***See*** Pa.R.E. 613(c). As for hearsay exceptions, the Rules provide, in pertinent part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

*(Footnote Continued Next Page)*

sustained the objection, determining that none of the proffered exceptions applied. However, the court allowed Ms. Davila to testify about her observations of Appellant during the call, namely that he was nervous, shaky, and scared. *See* N.T. Trial, 5/2/23, at 82-84.

In his Rule 1925(b) statement, Appellant again listed prior consistent statement, present sense impression, and excited utterance as reasons why the excluded testimony should have been admitted to corroborate his duress defense. In its opinion, the trial court addressed only prior consistent statement as a basis for admission of the hearsay. Appellant abandoned that argument on appeal, now asserting only that the statements were admissible under the other two exceptions. His argument is as follows:

> In the instant case, Appellant was describing the events between him, . . . Melendez and Trooper Gilbert to his partner [Ms.] Davila while they were happening and relating to the startling event of being stopped and questioned by the [t]rooper. The trial court therefore erred in prohibiting Ms. Davila from testifying what Appellant was saying to her on the telephone. This evidence would have further corroborated Appellant's version of the events that the drugs were not his, that the drugs were thrown to him from . . . Melendez, that . . . Melendez told the Appellant to hide the drugs and that the Appellant was threatened by . . . Melendez if he did not comply.

_____

**(1) Present Sense Impression**. A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it. . . .

**(2) Excited Utterance**. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. . . .

Pa.R.E. 803.

- 12 -

Appellant's brief at 47 (unnecessary articles omitted).

We are unpersuaded that relief is due. Significantly, since Appellant does not suggest that Ms. Davila overheard Melendez threaten him, her testimony would not have corroborated Appellant's version of events. Instead, it merely tended to prove that his version of events remained consistent over time.

Moreover, assuming *arguendo* that the statements were admissible excited utterances or present sense impressions, we agree with the Commonwealth that any error by the trial court in excluding them was harmless. *See* Commonwealth's brief at 33-35. Appellant fully explained to the jury that the only reason he had the drugs in his pants was because he feared Melendez's threats. Since we have already held that this evidence did not warrant a duress instruction, corroboration of the insufficient facts would not have altered that outcome.

Additionally, the jury found Appellant not guilty of PWID, but guilty of conspiracy to commit PWID. In other words, the jury determined that Appellant and Melendez agreed to obtain the drugs for distribution to others but declined to hold Appellant liable for their physical possession. This verdict is fully consistent with having accepted that Appellant's testimony that he secreted the drugs on his person only because Melendez demanded it, while rejecting his protestation that he was unaware that he had driven his good friend to Philadelphia for the purpose of acquiring those drugs.

As such, we are convinced that the verdict would have been the same even if it heard that Appellant told Ms. Davila the same thing he told the jury about Melendez's coercion to make Appellant hide the drugs in his pants. ***See***, ***e.g.***, ***Commonwealth v. DeJesus***, 880 A.2d 608, 614 (Pa. 2005) ("[A]n evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict.").

For the foregoing reasons, Appellant has not given us cause to disturb his convictions or his sentence. Therefore, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/12/2025

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, COMMONWEALTH OF PENNSYLVANIA CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :     SUPERIOR COURT
                                       :     NO. 2601 EDA 2023

          v.                         :

                                         :     TRIAL COURT

WILFRED O. ALVAREZ-RODRIGUEZ    :     NO. 1365-2022

**ROGERS, J.**                                          **June 20, 2024**

## *OPINION*

## I. INTRODUCTION

Wilfred O. Alvarez-Rodriguez ("Appellant") has appealed to the Superior Court of Pennsylvania ("Superior Court") from the judgment of sentence entered on July 19, 2023.[1] Following a three (3) day jury trial, the jury found Appellant guilty of one (1) count each of criminal conspiracy to commit possession with intent to deliver graded as a felony,[2] resisting arrest graded as a misdemeanor of the second degree,[3] and drug paraphernalia graded as a

---

[1] Although Appellant filed his notice of appeal from the court's August 30, 2023 Order denying his Motion to Reconsider and Modify Sentence, the appeal properly lies from his judgment of sentence made final by the denial of his post-sentence motion. *See Commonwealth v. Wenzel*, 248 A.3d 540, 547 n.4 (Pa.Super. 2021) (citing *Commonwealth v. Rivera*, 238 A.3d 482, 489 n.1 (Pa.Super. 2020)).

[2] 18 Pa.C.S.A. § 903.

[3] 18 Pa.C.S.A. § 5104.

MontcoPA Clerk of Courts
JUN 20 '24 AM9:38

misdemeanor.[4] The court imposed a sentence in the mitigated range of five (5) to ten (10) years on Count 5, criminal conspiracy; and a consecutive term in the aggravated range of one (1) to two (2) years on Count 4, resisting arrest. The court directed a determination of guilt without further penalty on Count 3, drug paraphernalia. This court respectfully requests that Appellant's judgment of sentence be affirmed.

## II.    FACTS AND PROCEDURAL HISTORY

The relevant facts and procedural history underlying this appeal are as follows. At approximately 4:40 p.m. on January 26, 2022, Pennsylvania State Trooper Joseph Gilbert was driving an unmarked silver Ford Explorer police vehicle with interior lights, a siren, and equipped with a working dash camera and computer, traveling westbound on Interstate 76 ("I-76") when he observed a red Honda Civic traveling in the same direction in front of him with heavily tinted side and rear windows. (Notes of Testimony Pretrial Motions 11/4/22 ("N.T. Suppression") at 7-10; Commonwealth Exhibit C-1, Dash Cam Video ("Video");[5] Exhibit C-2, Four (4) Photographs depicting the side and rear windows of the Honda Civic; Notes of Testimony Trial ("N.T. Trial") 5/1/23, at 43-45).

---

[4] 35 P.S. § 780-113 (A)(32).

[5] The Commonwealth played the Dash Camera video of the traffic stop during Trooper Gilbert's testimony at the Hearing and at Trial. (N.T. Suppression at 8-57; N.T. Trial 5/1/23, at 46-62).

Because Trooper Gilbert could not see into the vehicle and, consequently, observe any occupants inside due to the heavy tint on the rear and sides of the vehicle after following it for some time, he activated his lights and siren signaling his intention to conduct a traffic stop. (N.T. Suppression at 9-10). Instead of stopping in the wide gore area off of the highway, the Honda continued until stopping on a narrow shoulder. (N.T. Suppression at 12; N.T. Trial 5/1/23, at 46-47).

Trooper Gilbert approached the vehicle on the passenger side for his safety because of where the driver had pulled over in heavy traffic. (N.T. Suppression at 10-11, 12; Video at 1:40; N.T. Trial 5/1/23, at 47). At that time, Trooper Gilbert observed Appellant, a front-seat passenger, and his alleged co-conspirator, Delvalle-Melendez, the operator of the vehicle ("the driver"). (N.T. Suppression at 11).

Trooper Gilbert's first observation while he was speaking with Appellant and the driver was the strong odor of raw marijuana coming from inside of the vehicle. The Trooper also observed that Appellant's legs and hands were shaking, he was on the phone, and he had a black fanny pack bag on his lap. (N.T. Suppression at 11-12; N.T. Trial 5/1/23, at 48). Trooper Gilbert testified that, in his training and experience, fanny packs are commonly known by law enforcement to be used to store illegal narcotics and/or firearms. (N.T. Suppression at 12; N.T. Trial 5/1/23, at 85).

3

Trooper Gilbert asked the driver for his ID, registration, and insurance. Because of the strong smell of raw marijuana coming from inside the vehicle, Appellant's nervousness, and the fanny pack on his lap, the Trooper also requested Appellant's identification. At that time, Trooper Gilbert believed that there was criminal activity afoot. (N.T. Suppression at 12-13). Appellant provided his name and date of birth as part of his identification, but not a physical copy of his ID. Both Appellant and the driver appeared to understand what the Trooper was saying and both responded in English. (N.T. Suppression at 13, 14; Video at 2:15-3:00).

Trooper Gilbert asked the driver to exit the car to show him why the Trooper had stopped the car, following which the Trooper conducted a quick frisk for weapons for the safety of the driver, Appellant, and himself. The Trooper testified that he checks every person who comes out of a car for his and their safety. (N.T. Suppression at 13-14; N.T. Trial 5/1/23, at 50). The Trooper also testified that, in his experience, drugs are coupled with guns. (N.T. Suppression at 13, 35; Video at 3:02-3:50). In response to Trooper Gilbert's questions, the driver replied that he lives in Lebanon, Pennsylvania, and that Appellant's girlfriend owned the car. (Video at 3:55, 4:25-4:30).

Prior to being asked about his itinerary, the driver started telling the Trooper about his reason for being in the area. (N.T. Trial 5/1/23, at 50-52). He provided this information in English. Specifically, the driver stated that he was picking up some items from his girlfriend's, sometimes fiancée's

4

("Amesgi"), house in Philadelphia. (N.T. Suppression at 14; Video at 3:53-4:08, 6:35-6:42). When Trooper Gilbert asked the driver where specifically in Philadelphia he was traveling from, the driver responded that he was not familiar with the area and could not tell the Trooper with any specificity. (N.T. Suppression at 14-15; Video at 4:10-4:15).

Trooper Gilbert explained to the driver why he pulled the vehicle over and that the Trooper's plan was to only give him a warning if everything checked out. The driver replied that he did not want a ticket and did not want any trouble. The Trooper described the driver as still appearing to be nervous even though he had been told he was not going to receive a ticket. During this exchange, the driver asked Trooper Gilbert questions in English about a different car and traffic tickets that he had previously received. (N.T. Suppression at 15-16; Video at 4:18, 8:25-9:40, 10:10).

Trooper Gilbert ran the driver's information and it came back that Delvalle-Melendez was a suspended operator, with a criminal history of drug possession and a revoked gun permit. The driver also offered that he had been arrested for simple assault. (N.T. Suppression at 16-17, 19; Video at 13:50-14:20). The Trooper asked the driver whether he had a medical marijuana card, and he showed Trooper Gilbert a marijuana card inside his wallet as well as a clear plastic sandwich baggie containing a green leafy substance that the Trooper believed to be marijuana. The plastic baggie had no markings or any

5

other indication that the contents had been dispensed from a dispensary or a licensed practitioner. (*Id.* at 17; Video at 11:58-12:20).

By this point, Appellant had been in the Honda Civic alone for several minutes. (N.T. Trial 5/1/23, at 85). Trooper Gilbert went back to the passenger side of the vehicle and asked Appellant where the pair were coming from in Philadelphia. Appellant was still on the phone, even after the Trooper had told him to end the call, and still nervous and shaking. As with the driver, Appellant could not provide a more detailed description of where in Philadelphia they had just visited. Additionally, Trooper Gilbert noticed that the black fanny pack was no longer on Appellant's lap. (N.T. Suppression at 17-19; Video at 12:35-13:15; N.T. Trial 5/1/23, at 53).

It was also at this point that Trooper Gilbert noticed that there was a young boy, approximately four (4) years old, lying down, sleeping under a coat in the backseat of the Honda and not restrained in a child car seat. (N.T. Suppression at 20; N.T. Trial 5/1/23, at 56; Video at 13:20). By this time, Trooper Ruiz had arrived as backup. (N.T. Suppression at 48; Video at 14:15).

Trooper Gilbert and the driver then discussed his revoked gun permit. Trooper Gilbert asked the driver if there were any weapons in the vehicle, to which the driver replied there were not, and that the Trooper could check the car. (N.T. Suppression at 19; Video at 15:15-15:35; N.T. Trial 5/1/23, at 54). Trooper Gilbert explained to the driver that he did not have to consent to a search, and that he could change his mind and revoke his consent at any

6

time. (N.T. Suppression at 19-20; Video at 15:45-16:08; N.T. Trial 5/1/23, at 55).

Trooper Gilbert then asked Appellant to exit the front passenger side so that he could search the vehicle and explained to him that the Trooper would conduct a frisk for weapons. Appellant complied, volunteering to pull out his pockets. Appellant also told the Trooper that he could search the car if he wanted. (N.T. Suppression at 20, 28-30, 34-35, 45-46; Video at 16:10-16:50; N.T. Trial 5/1/23, at 55). The young boy continued to sleep while Trooper Gilbert conducted a brief, cursory search of the vehicle. (Video at 17:10-25:55).

During Trooper Gilbert's search of the inside of the vehicle, the trunk, and under the hood, the Trooper observed a powered-on flip phone in the driver's door panel, which in his training and experience is called a "burner" phone often used in narcotics sales, and the black bag that had been on Appellant's lap earlier, was now tucked underneath the passenger seat, and completely empty. (N.T. Suppression at 20-21, 38; N.T. Trial 5/1/23, at 57). Trooper Gilbert did not find any drug user paraphernalia located in the vehicle. (N.T. Suppression at 38-39; N.T. Trial 5/1/23, at 57).

Trooper Gilbert testified at that point he believed that either or both the driver and Appellant had something illegal on their persons based on, among other things, the fact that upon the Trooper's approach, Appellant had been holding the black fanny pack on his lap, but later the Trooper noticed the bag

was no longer there, and during the search, the Trooper found the bag empty and tucked under Appellant's seat. (N.T. Suppression at 21).

Finding nothing else in the vehicle other than the flip phone and the empty fanny pack, Trooper Gilbert asked the driver what it was that he had picked up from his girlfriend's house in Philadelphia, to which Delvalle-Melendez responded that he had dropped something off, and had not picked up anything, changing his original statement to the Trooper. (Video at 26:00-26:22; N.T. Trial 5/1/23, at 58). Trooper Gilbert also asked the driver what had been in the bag, to which he replied, just "trash". The driver then consented to a more thorough search of his person, which did not reveal anything more than the plastic sandwich baggie with the small amount of marijuana that he had already produced. (N.T. Suppression at 21-22; Video at 26:20-28:14, 28:30-28:50). Trooper Gilbert testified that the driver broke eye contact and looked away, appearing a little more nervous when the Trooper asked him if there was anything illegal on his passenger. (N.T. Suppression at 22; N.T. Trial 5/1/23, at 59-60).

Trooper Gilbert then asked Appellant what had been in the black bag that was now under the passenger seat, to which Appellant replied a little bit of weed, a "blunt" that was not his. (N.T. Suppression at 23, 40; Video at 31:10-31:40, 31:51-31:54). Upon further discussion after Trooper Gilbert told Appellant that the bag was empty and that the Trooper would check him next, Appellant gave consent for a search of his person by stating, "you can check

8

me", "you can check me". (N.T. Suppression at 23, 39, 50; Video at 31:44-31:46; N.T. Trial 5/1/23, at 60). Trooper Gilbert testified that he suspected that either narcotics or a weapon were tucked somewhere on Appellant's person because when the Trooper first frisked him, Appellant had emptied out most of his pockets. Based on his training and experience, Trooper Gilbert testified that narcotics users and dealers hide the illegal narcotics inside of their groin area to avoid detection. (N.T. Trial 5/1/23, at 61).

Trooper Gilbert started to pat down Appellant, but when the Trooper hit a large, square package that sounded like plastic between his legs, Appellant pulled away, started to resist, and attempted to flee. (N.T. Suppression at 23-24, 50-51, 53, 54; Video at 31:58-32:20; N.T. Trial 5/1/23, at 60-61, 81-83). As Trooper Gilbert tackled Appellant to the ground approximately a foot from the white line on I-76 during rush hour, Appellant and the driver began yelling at each other in Spanish, while Appellant also yelled "he threw it at me", "he threw it on my lap", and "he gave it to me" in English. (N.T. Suppression at 24, 52-53; Video at 32:25-33:02; N.T. Trial 5/1/23, at 68-69, 71-73, 83, 88). This was the first time Appellant had said that the driver had thrown the fanny pack at him. (*Id.* at 71, 77, 87, 90).

Trooper Gilbert testified that Appellant was under arrest for resisting and attempting to flee at that point. (N.T. Suppression at 54). Trooper Ruiz detained the driver. (N.T. Suppression at 24). Once Appellant and the driver were both detained, Trooper Gilbert pulled a rectangular plastic bag out from

Appellant's groin area that contained two (2) smaller bags, both filled with a "white-ish" powder and field tested positive for fentanyl. (N.T. Suppression at 24-26, 58; Commonwealth Exhibit C-3, Photograph of the bag of fentanyl recovered from Appellant's inside pant leg; N.T. Trial 5/1/23, at 64-66).

Trooper Gilbert then applied for and executed a search warrant for the vehicle to conduct a more thorough search, and recovered the flip phone located in his original search. (N.T. Suppression at 26-27). Trooper Gilbert also applied for a search warrant for the flip phone recovered from the vehicle. He explained his basis for doing so was the fact that there was a bulk amount of controlled substance recovered, Appellant and the driver were coming from a source city and returning to another source city, a flip phone is indicative of drug sales, and the information contained on the phone may further an investigation of where it was coming from, where it was going to, and things of that nature. (N.T. Suppression at 27; N.T. Trial 5/1/23, at 66-67). Law enforcement determined that the approximate weight of the recovered fentanyl was just under 200 grams. (N.T. Suppression at 66, 67; N.T. Trial 5/1/23, at 64).

The Commonwealth filed a Criminal Complaint and Affidavit of Probable Cause on January 27, 2022. On April 13, 2022, Laurie R. Jubelirer, Esquire, entered her appearance on behalf of Appellant. On June 10, 2022, the Commonwealth filed the bills of information, charging Appellant with a total of five (5) counts: Controlled Substance/Possession with Intent to

10

Manufacture/Deliver Fentanyl, Controlled Substance/Possession Marijuana, Drug Paraphernalia, Resisting Arrest, and Criminal Conspiracy to Commit Possession with Intent to Deliver Fentanyl.

Attorney Jubelirer filed an omnibus pretrial motion to suppress physical evidence on July 5, 2022. At the hearing on Appellant's motion to suppress evidence, Trooper Gilbert testified that he has worked for the Pennsylvania State Police for approximately seven (7) years, since 2015. In January of 2022, Trooper Gilbert was part of a crime reduction team for Troop K with the State Police. His duties involved patrolling and assisting all three stations in Troop K, which include Skippack, Media, and Belmont and covering Philadelphia, Delaware and Montgomery counties. (N.T. Suppression at 5-6; N.T. Trial at 42-43).

During that time, Trooper Gilbert has assisted the Crime Scene Units as well as the Vice and Narcotic Units in all three stations assigned to Troop K. Additionally, he assisted the PSP Strike Force, Eastern Interdiction and PSP Shield Units as well. (N.T. Suppression at 6).

Trooper Gilbert has received Pennsylvania State Police Shield training, which is a week-long program focusing on interdicting criminal activity on and off the highway, as well as training from the Northeast Hunter Task Force, which included detecting misleading behaviors, interview interrogation and conducting complete traffic stops, all relative to narcotic investigations. (N.T. Suppression at 6-7; N.T. Trial 5/1/23, at 42-43).

11

Trooper Gilbert testified that he has been involved with hundreds of drug cases and has conducted well over one thousand (1,000) traffic stops as a State Trooper. (N.T. Suppression at 7; N.T. Trial 5/1/23, at 43).

Working for the Pennsylvania State Police, Trooper Gilbert has been a part of many details, including Operation Safe Street and Trigger Lock in Chester City, as well as Operation Stamp Out in Philadelphia. During those times, Trooper Gilbert testified that he has engaged in several encounters, assisted with several arrests, and made several arrests on his own regarding illegally controlled substances involving firearms inside of fanny packs. (N.T. Suppression at 43).

Following the November 4, 2022 hearing on Appellant's pretrial motions, and after a thorough review of the record, the court issued its Findings of Fact and Conclusions of Law in support of its denial of the motion to suppress on April 3, 2023. Assistant District Attorney Libby Hemler and Attorney Jubelirer selected a jury on Monday, May 1, 2023. Prior to opening statements, ADA Hemler argued a motion *in limine* that she had filed the Friday before trial seeking to preclude the admission of portions of video and testimony related to the conversation between Appellant and Delvalle-Melendez as self-serving hearsay. Attorney Jubelirer argued that the statements supported Appellant's defense of duress and were admissible as exceptions to hearsay. (N.T. Trial 5/1/23, at 15-21). The court granted the Commonwealth's motion precluding the introduction during Appellant's case-in-chief. Attorney Jubelirer did,

however, play those portions of the video during her cross examination of Trooper Gilbert. (*Id.* at 76-77, 80). Because Attorney Jubelirer played the video containing portions in Spanish, the court allowed the Commonwealth to present the testimony of Detective Vincent Fuentes of the Montgomery County Detective Bureau to explain his translation of what the codefendants had said to one another in Spanish once Trooper Gilbert had discovered the package containing fentanyl in Appellant's pants. (N.T. Trial 5/2/23, at 6-11). The loose translation of the Spanish portions of the dialogue is as follows:

WR:   Wildred O Alvarez-Rodriguez
JM:   Jose Delvalle-Melendez
SL:   Sounds Like
UI:   Unintelligible
UK:   Unknown

WR:   "Chino" [colloquial language] they got us!  "Chino Cabron!" [colloquial terminology to signify jackass, bastard, dumbass Chino, adulterer...] dumbass please don't do it.  Chino. Dumbass don't do that, take that dumbass!  It's here on top, dumbass Chino they are going to give me life, Dumbass!

JM:   Dumbass, but what do you...

WR:   Tell them it's yours Chino.  Tell them it's yours, it's not mine!  Don't be a dumbass Chino.  Dumbass Chino!

WR:   Chino dumbass, respond dumbass.  Respond, dumbass UI respond dumbass for yourself.

JM:   What do you want me to say dumbass?

WR:   Dumbass, tell them it's yours!  You threw it at me.

UK:   Give me a break, relax yourself.

WR:   I'm going to kill you in the cell.

13

WR:   Chino dumbass tell them!

JM:   I have the boy, dumbass!

JM:   Look, dumbass.

WR:   Dumbass answer me.

JM:   You're luck jackass.

WR:   Tell them, bastard!

JM:   But what do you want, but bastard...

WR:   Dumbass tell them!

JM:   Tell me...

WR:   ....That it's yours!

JM:   No UI.

WR:   You told me to put it in my pants man!  Tell them it's yours, tell them!  You're really going to leave me in there, bastard?

JM:   SL why dumbass?  Give me a break SL for real give me a break!!

WR:   Talk to them!

JM:   UI

WR:   Dumbass I can't be arrested my son is going to be born in a couple of days bastard, I didn't know anything.

JM:   What's happening, give me a break dumbass.

WR:   You threw that at me!  You told me to put it in my pants!

WR:   Chino dumbass for real!  You're going to leave me with this. Are you serious?  I can't believe this!  They're going to take me in!

WR:   Talk you bastard.

JM:   Devil, dumbass.

WR:   Talk you bastard. I have UI.

(N.T. Trial 5/2/23, at 16-19; Loose Translation of Spanish Dialogue, Commonwealth's Trial Exhibit C-4).

The Commonwealth also presented the testimony of Corporal Sergio Colon as an expert in the field of illegal narcotics and drug trafficking. Corporal Colon explained for the jury that the one hundred and ninety-two (192) grams of fentanyl in two (2) separate packages were intended to be broken down into bundles for resale. With two (2) occupants in the vehicle, the Corporal testified that it was quite possible that they were each meant to take one of the bags. (N.T. Trial 5/2/23, at 45). The corporal estimated that amount could be broken down into about 380 bundles, which in turn could be mixed and made into approximately 5,376 individual bags of fentanyl. He also testified that the smallest amount of pure fentanyl is deadly. (*Id.* at 45-47). Corporal Colon opined that the amount of fentanyl found on Appellant was indicative of someone planning to redistribute and not purchased for personal use. (*Id.* at 48-49, 62-63). Finally, Corporal Colon testified about why narcotics traffickers ride with a trusted confidant when traveling to acquire more narcotics, and how they also use third party vehicles and burner phones to evade detection. (*Id.* at 49-50). On cross examination, Corporal Colon testified that it is common in his experience that when someone is

arrested for drugs in the presence of another person they have been engaging in trafficking with to say that the drugs are not mine. (*Id.* at 55, 57).

Following the close of the Commonwealth's case, Attorney Jubelirer made an oral motion for judgment of acquittal, challenging the sufficiency of the evidence to proceed on the counts of resisting arrest, possession of drug paraphernalia, and criminal conspiracy. (N.T. Trial 5/2/23, at 64-69). The court denied the motion. (*Id.*).

In his defense, Appellant presented the testimony of Yamilez Davila, his live in girlfriend and the mother of his son. (*Id.* at 71-72). Ms. Davila testified that on January 26, 2022, she was eight and one-half (8 1/2) months pregnant and could not drive, so Appellant drove her to work that morning. Her understanding was that Appellant would then pick up his very good friend Jose Delvalle-Melendez and take Mr. Melendez to pick up some car parts. (*Id.* at 72-73, 76-77). The couple had intended to name Delvalle-Melendez as her son's godfather. (*Id.* at 72-73).

Ms. Davila testified that she received a phone call from Appellant that afternoon at approximately 4:45 p.m. while Appellant was on his way home. (*Id.* at 77). When Attorney Jubelirer asked Ms. Davila what Appellant had said to her over the phone, Assistant District Attorney Hemler objected based on self-serving hearsay that did not fall under an exception to the rule. (*Id.* at 77, 79). Attorney Jubelirer argued that the testimony was related to Appellant's defense of duress, that it was not being presented for the truth of

16

the matter, and that exceptions to the hearsay rule applied. The court sustained the Commonwealth's objection. (*Id.* at 78-80, 152-53).

Ms. Davila testified that after the initial conversation in which Appellant asked about the vehicle registration, she called him back on FaceTime and observed that he was nervous and scared. (*Id.* at 82-86). She also testified that she was aware of prior incidents of Delvalle-Melendez doing stuff like purchasing drugs but that they never got involved in it. (*Id.* at 93).

After a qualifying examination by Attorney Jubelirer and the court, Appellant testified on his own behalf. Appellant testified that he has lived in Pennsylvania for about fourteen (14) years and had known Delvalle-Melendez for about a month as of January 26, 2022; although he later testified that he had known him for a few months, and then about five (5) or six (6) months. (N.T. Trial 5/2/23, at 100, 137-38).

Appellant explained that on that morning Delvalle-Melendez had asked Appellant to take him to his uncle's house in Philadelphia to get some car parts. (*Id.* at 103, 108, 110). He testified that after dropping off his baby's mom, Ms. Davila, at her job, Appellant picked up Delvalle-Melendez, who also brought his young son. (*Id.* at 105). Appellant explained that Delvalle-Melendez told a story about an altercation with his "baby mom", how he had punched her because he lost control and now was going to jail. (*Id.* at 106-07). He testified that he was feeling aggravated because the trip was taking so long and he did not know where he was going. (*Id.* at 107). Finally, after

17

driving approximately two (2) hours from Lebanon to somewhere in Philadelphia, Appellant parked in a parking lot and stayed with Delvalle-Melendez's son while Delvalle-Melendez met with a man who Appellant assumed was his uncle for approximately twenty (20) to twenty-five (25) minutes. (*Id.* at 107, 108-09). Delvalle-Melendez returned with his uncle in a jeep and the four (4) of them went to lunch. (*Id.* at 109-10, 112). Appellant remained aggravated at how long the trip was taking as he had to get back to pick up Ms. Davila. (*Id.* at 112).

After lunch they made their way back to the parking lot where Appellant had parked the Honda Civic, and Delvalle-Melendez stayed with the uncle for a few minutes before returning to the Honda and insisting that he drive back to Lebanon. (*Id.* at 114-16). Appellant estimated that they left Philadelphia after 2 p.m. and Delvalle-Melendez had been driving approximately an hour when the police stopped them. (*Id.* at 116-17). He stated that Delvalle-Melendez tossed a bag at him and told him to tuck it. (*Id.* at 118). Appellant testified that Delvalle-Melendez said to him that if the police take Delvalle-Melendez's kid from him, Delvalle-Melendez would kill Appellant. (*Id.*).

Appellant testified that Delvalle-Melendez kept threatening Appellant that he would kill Appellant if the police took Delvalle-Melendez's son, and Appellant kept telling Delvalle-Melendez that he had a baby coming in two (2) weeks. (*Id.* at 118-20). Appellant told the jury that he had seen Delvalle-Melendez's uncle show them a gun and was concerned Delvalle-Melendez may

18

have one too, although he had not seen Delvalle-Melendez with a weapon. (*Id.* at 119-20, 141). He testified that he had already put the narcotics in his pants before the police approached his window. (*Id.* at 120-21). Appellant explained that he was shaking and panicking because Delvalle-Melendez was yelling at him, making him tuck the drugs, and he didn't want to go to jail because his son would be born in two weeks. (*Id.* at 122, 124). Appellant denied knowing about the narcotics before they were thrown at him, and stated that he did not give the police permission to pat him down a second time. (*Id.* at 124,125, 127).

Appellant also testified that he was not resisting arrest, but rather trying to turn around to explain to the officer what had happened, that he'd been used, that Delvalle-Melendez had tossed the drugs to him and they were not his drugs. (*Id.* at 127-28). He testified that he told Trooper Gilbert another three (3) or four (4) times in the police car that Delvalle-Melendez tossed the drugs to him. (*Id.* at 128). Appellant explained that he did not say "they got us" to Delvalle-Melendez but, instead, he testified that he said "they got it". (*Id.* at 131). Additionally, Appellant denied yelling at Delvalle-Melendez that he would kill Delvalle-Melendez but, instead, said "I am going to kill myself". (*Id.* at 133).

On cross examination, Appellant denied knowing that Delvalle-Melendez sold illegal narcotics, contrary to Ms. Davila's testimony. (*Id.* at 93, 140). Appellant confirmed that he did not tell Trooper Gilbert that Appellant

19

had thrown a bag containing drugs at him or had threatened him during those several minutes when he was alone with the Trooper several times before the second pat down. (*Id.* at 142-43, 150). Appellant conceded that he made the decision to put the narcotics down his pants. (*Id.* at 146). Attorney Jubelirer then renewed her objection to the court's ruling denying her request to offer Ms. Davila's testimony to corroborate Appellant's state of mind as the Trooper was pulling over her Honda Civic. (*Id.* at 152-53).

On rebuttal, the Commonwealth introduced the stipulations regarding Appellant's guilty plea to robbery in January of 2018, and a guilty plea to tampering with or fabricating physical evidence in December of 2019. (*Id.* at 154). Finally, the court heard argument on Appellant's oral motion for the jury instruction for duress as a defense and denied the request. (*Id.* at 156-62). After closing arguments, the court read the jury instructions. (*Id.* at 164-200).

During their deliberations, the jury asked that Ms. Davilia's testimony be read back regarding her knowledge of Delvalle-Melendez's prior incidents of purchasing or dealing drugs and why he wanted to use her car that day. (N.T. Trial 5/3/23, at 5-6). The jury also requested a definition of "intent" with regard to the first charge for possession with intent to deliver. (*Id.* at 6-10). Finally, the jury asked to re-watch the dash camera video footage from the second frisk of Appellant to when the officer was able to place handcuffs on him. (*Id.* at 11).

20

After deliberating, the jury found Appellant not guilty on Count 1 for possession with intent to manufacture/deliver Fentanyl, guilty to the three (3) counts noted above, and the Commonwealth withdrew Count 2 for possession of marijuana. (*Id.* at 10-11, 12-13). The jury then rendered their decision that the weight of the fentanyl which Appellant conspired to possess with the intent to deliver was 192 grams. (*Id.* at 21). The court deferred sentencing, and directed that a presentence investigation ("PSI"), a psychological evaluation, and a drug and alcohol evaluation be performed at Appellant's request. (*Id.* at 22-23).

Following defense continuance requests, the court scheduled Appellant's sentencing hearing for July 19, 2023. On July 17, 2023, Attorney Jubelirer filed a memorandum of law in support of a motion for extraordinary relief seeking a new trial based on the court's refusal to charge the jury on duress and precluding the testimony of Ms. Davila pertaining to Appellant's state of mind before the traffic stop. In the memorandum, Appellant posited that he had presented sufficient evidence to support the instruction. (Defendant's Memorandum of Law filed 7/17/23, at 2-3). In addition, Appellant claimed that the court erred by sustaining the Commonwealth's objection to Ms. Davila's testimony about the conversation she had with Appellant on FaceTime moments before the traffic stop. (*Id.* at 3-6).

At sentencing, Attorney Jubelirer first argued Appellant's motion for extraordinary relief, which the court denied. (N.T. Sentencing 7/19/23, at 5-

21

10, 11). Attorney Jubelirer then presented the testimony of Thais Vazquez-Carrero, Appellant's cousin, and Shawna Rodriguez, Appellant's mother, on his behalf. (*Id.* at 13-20). The court also acknowledged receiving several letters of reference from family members and friends. (*Id.* at 5, 14-15). The court heard well-made arguments from Attorney Jubelirer on behalf of her client as well as from ADA Hemler on behalf of the Commonwealth. (*Id.* at 21-25, 25-30, 30-33).

The court also heard from Appellant by way of allocution. Appellant explained that he felt threatened for his life, thought he was doing a favor for a friend, and he did not have any knowledge of the drugs before they were thrown at him. (*Id.* at 34-35).

After reciting the facts of this case, the court explained the reasoning and rationale behind its sentence as follows:

> So in my due diligence in terms of sentencing on this particular case, I had reviewed the PSI report, which is always something that I put great reliance upon, and I reviewed the PPI evaluation report. And I noticed some of the same issues of physical and perhaps mental issues that this defendant has going on. And I will treat that as part of my responsibility under the sentencing statute to consider rehabilitation.
>
> I considered the sentencing guidelines. I considered the letters that I received. Actually, I received those yesterday from -- through defendant's counsel. And I have also reviewed the sentencing statute.
>
> And as counsel mentions, that sentencing statute calls for the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. And it directs trial

22

judges to also consider any guidelines for sentencing in that way, in that manner as well.

It also considers the issue of deterrence. And when we talk about deterrence, we talk about both general and specific deterren[ce].

General deterren[ce], of course, being a message presumably to the public stating that this type of behavior cannot be continued and there has to be a consequence.

As your lawyer mentioned, I sentenced one on -- a co-defendant in this case Monday, and I have three sentencings on Friday this week all on fentanyl. And two of which that led to the death of people.

The Court has, as I always do in these matters, research. There has been 70,601 deaths last year in the United States from fentanyl, according to the National Center for Health Statistics, the NCHS, the Center For Disease Control.

The amount of fentanyl, as I indicated, could kill many people based upon the testimony of that expert.

The Court respects the decision of the jury. I believe the jury made the right decision in this case, in part based upon the facts that were presented as well as other factors, including this defendant's prior criminal arrest history.

I will now address the history of this defendant as well.

He began his experience with the criminal justice system as a juvenile. On January 22 of 2016, he was charged with possession of a small amount of marijuana. The case was not really adjudicated, it appears, in the juvenile court.

On February 21, 2017, he was charged with fleeing and eluding police, a felony of the third degree. He pled guilty to that charge of fleeing and eluding police. He was sentenced to nine months to twenty-three months.

He violated the supervision on that and was resentenced for a period of fifteen months.

He violated his supervision. Sentenced to two months to twenty-three months.

He violated his parole November '18 and October 2019.

On April 25, 2017, he was charged with robbery, serious bodily injury, prohibited offensive weapons, recklessly endangering another person. He pled guilty to the charges of prohibitive offensive weapons, robbery, simple assault, and recklessly endangering another. And he was sentenced to eleven and a half months to twenty-three months.

He violated his parole on that matter.

On May 12, 2017, he was charged with possession with intent to deliver, possession of a controlled substance, and he pled guilty to that charge.

On the charge of possession with intent to deliver, he was sentenced to nine to twenty-three months.

On the possession of a controlled substance, he was sentenced to one month to twelve months.

And those sentences were running concurrent to one another.

He violated his parole again on that.

On May 3, 2019, he was charged with tampering, fabricating physical evidence, use of drug paraphernalia, disorderly conduct, resisting arrest.

And on December 4, 2019, he pled guilty to those charges.

On those charges of possession of a controlled substance and use of drug paraphernalia, he was sentenced to three to twelve months.

On the charge of tampering, fabricating physical evidence, misdemeanor of the second degree, and resisting arrest, he was sentenced to three to twelve months.

24

On August 15, 2019, he was charged with possession with intent to deliver, possession of a controlled substance, use of drug paraphernalia.

On April 29th, he pled guilty on those charges. And with respect to possession with intent to deliver and criminal use of a communication facility, he was sentenced to eleven to twenty-three months.

And now we are here on this particular offense.

And yes, the Commonwealth is right, there is a pattern that was going on here. This is not the first time that he has done this. And again, this must stop.

(N.T. Sentencing at 39-43).

With all of that in mind, and as noted above, the court sentenced Appellant to a term of five (5) to ten (10) years of state imprisonment on Count 5, criminal conspiracy to commit possession with intent to deliver, and one (1) to two (2) years of state imprisonment on Count 4 resisting arrest, consecutive to Count 5. (*Id.* at 44). Accordingly, the court sentenced Appellant in the mitigated range for criminal conspiracy and the aggravated range for resisting arrest. Finally, the court made an adjudication of guilt without further penalty on Count 3, possession of drug paraphernalia. (*Id.* at 44-45).

On July 27, 2023, Appellant filed a written post-sentence motion seeking reconsideration and a modification of his sentence, claiming that the sentence for resisting arrest, in particular, was excessive under the circumstances. The court heard oral argument on Appellant's motion on August 21, 2023. Counsel highlighted all of the information the court had already heard, read, observed, and considered before and/or during the Trial

25

and the Sentencing Hearing. (N.T. Motion for Reconsideration 8/21/23). After another thorough review of the record in this matter, the court issued an order denying Appellant's motion on August 30, 2023.

Appellant filed a timely notice of appeal on September 27, 2023. This court directed that Appellant file a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) ("Statement") by order entered on October 2, 2023. Attorney Jubelirer filed a motion to withdraw as counsel, which the court granted by order entered on October 3, 2023. The court then entered an order appointing the Montgomery County Public Defender's Office on October 5, 2023. Attorney Michael N. Huff filed a motion for extension of time on October 18, 2023, which the court granted by order entered on October 26, 2023. Appellant filed his Statement on December 5, 2023.

## III. ISSUES

Appellant raises the following issues on appeal:

1 [28].    The Trial Court erred in denying [Appellant's] Motion to Suppress Physical Evidence where the stop of the vehicle was without reasonable suspicion to believe a traffic violation had occurred or probable cause to believe a crime had occurred.

2 [29].    The Trial Court erred in denying [Appellant's] Motion to Suppress Physical Evidence where the pat down/search of [Appellant] was (1) without a warrant; (2) without consent; (3) without probable cause; (4) without evidence that [Appellant] was armed and dangerous; and (5) not a search incident to an arrest.

3 [30].    The stop of the vehicle and search of [Appellant] were in violation of [Appellant's] rights under the Fourth and

26

Fourteenth Amendments to the U.S. Constitution and Article I, Sec. 8 of the Pennsylvania Constitution.

4 [31].     The Trial Court and Defense Counsel erred in permitted [sic] Trooper Gilbert to offer expert opinions [sic] testimony without being qualified regarding: (1) fanny packs contain illegal contraband (N.T. at 85 (5/1/23)); (2) [Appellant's] behavior was consistent with them being "up to no good" (N.T. at 50 (5/1/23)); and (3) flip phones are used by drug dealers (N.T. at 57 (5/1/23)) in violation of Pa.R.E. 702.

5 [32].     The Trial Court erred in denying [Appellant's] request for a Duress Jury Instruction where the evidence presented at trial showed: (1) [Appellant] was arguing with the driver of the Honda to admit the drugs were his and that the driver threw them at [Appellant] before the Trooper approached the Honda (N.T. at 17-19 (5/2/2023)); (2) [Appellant] testified that the driver threatened to kill [Appellant] (N.T. at 118-119, 150-151 (5/2/2023)); The Appellant testified he felt "threatened", "scared", " pressured" and "terrified" because of the actions and words of the driver (N.T. at 119, 135, 143, 146, 151 (5/2/2023) and (4) [Appellant] testified that he was afraid that the driver could be armed because the driver's Uncle showed him a gun inside a fanny pack (N.T. at 119-120 (5/2/2023)).

6 [33].     The Trial Court erred in prohibiting [Appellant's] witness, Yamilez Davila, from testifying regarding the contents of their conversation on the telephone during the police stop which was admissible: (1) as a prior consistent statement of [Appellant] under Pa.R.E. 613(d); (2) present sense impression of [Appellant] under Pa.R.E. 803(1); (3) excited utterance of [Appellant] under Pa.R.E. 803(2); and (4) state of mind of [Appellant] under Pa.R.E. 803(3). See N.T. at 78-79 (5/2/2023). Thus depriving [Appellant] of a fair trial and due process.

7 [34].     The Trial Court erred, abused its discretion and imposed an excessive and unreasonable sentence where [Appellant] was sentenced at the top of the standard range of the Pennsylvania Sentencing Guidelines.

8 [35].     There is a substantial question that the sentenced [sic] was not appropriate under the Sentencing Code.

9 [36]. The Trial Court failed to adequately consider, as required by 204 Pa.Code §§ 303.1, 303.11, 303.13, *et. seq.*, 42 Pa.C.S.A. §§ 2154 and 9721(b), the following: (1) a probationary or county sentence as just punishment for the offense; (2) the advisory Pennsylvania Sentencing Guidelines mitigated sentence range; (3) the character and circumstances [sic] [Appellant] including but not limited to his age, family support, employment, educational history and expectation of his child being born; (4) the rehabilitative needs of [Appellant]; (5) the protection of the public; (6) the unlikelihood of recidivism of [Appellant]; (7) [Appellant's] acceptance of responsibility and remorse; (8) the rehabilitative efforts made by [Appellant]; and (9) the gravity, seriousness, and circumstances of the offense.

10 [37]. The sentence of the court was excessive and unduly harsh given the guidelines, the facts of the case and [Appellant's] character and role in the offense.

11 [38]. The Trial Court erred in denying [Appellant's] Motion for Judgment of Acquittal where the sufficiency, weight and credibility of the evidence at trial did not establish beyond a reasonable doubt that [Appellant] conspired to possess with intent to deliver Fentanyl where the credible envied [sic] showed that the drugs were thrown and hit [sic] and he was threatened death if he did not conceal them.

(Appellant's Statement, filed December 5, 2023).


## IV.   DISCUSSION

Appellant asserts in his first three issues on appeal that the court erred or abused its discretion in denying Appellant's motion to suppress physical evidence because the vehicle stop and subsequent search of Appellant were in violation of the Fourth and Fourteenth Amends to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. The court disagrees and will address these claims together.

28

Preliminary, although Attorney Jubelirer raised a challenge to the initial vehicle stop in an omnibus pretrial motion to suppress, counsel did not argue the claim at the hearing on the motion or in her subsequent briefing. Accordingly, the court finds that Appellant abandoned this issue. Moreover, the court properly determined that Trooper Gilbert had probable cause to stop the vehicle based on a violation of 75 Pa.C.S.A. § 4524(e)(1).[6]

Next, Appellant argues the pat down/search of Appellant was without a warrant, without consent, without probable cause, without evidence that Appellant was armed and dangerous, not a search incident to arrest, and in violation of Appellant's constitutional rights. No relief is due.

Pennsylvania law requires law enforcement to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent that those interactions compromise individual liberty. Of the three (3) types of interactions, here, the applicable type, an investigatory detention, requires that law enforcement have a reasonable suspicion that criminal activity is afoot. *Commonwealth v. Anderson*, 276 A.3d 282, 293 (Pa.Super. 2021) (citations omitted).

It is now settled that law enforcement officers may conduct certain unrelated checks during an otherwise lawful traffic stop, as long as they do not do so in a way that prolongs the stop, "absent the reasonable suspicion

---

[6] The court relies upon its Findings of Fact and Conclusions of Law filed on April 3, 2023, at pages 2-3, 11-12, and 18 as though incorporated herein.

29

ordinarily demanded to justify detaining an individual." *Commonwealth v. Galloway*, 265 A.3d 810, 815 (Pa.Super. 2021), *appeal denied*, 284 A.3d 870 (Pa. 2022) (examining *Rodriguez v. United States*, 575 U.S. 348, 372, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)).

> Pennsylvania law is clear that,
>
> [d]uring a traffic stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). "[I]f there is a legitimate stop for a traffic violation ...additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions."

*Commonwealth v. Harris*, 176 A.3d 1009, 1020 (Pa.Super. 2017) (citation omitted).

Moreover, it is inherently reasonable that an officer is concerned with safety when he or she detains a vehicle for a motor code violation and, accordingly, may inquire about the presence of weapons and may order the occupants to alight from the car. *Id.* at 1020-21 (citation omitted); *Commonwealth v. Malloy*, 257 A.3d 142, 150 (Pa.Super. 2021) (citations omitted).

To assess whether a detention is too long in duration to be justified as an investigative stop, courts examine whether law enforcement diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. Courts should consider whether the police are acting in a swiftly

30

developing situation, and in such cases the court should not indulge in unrealistic second-guessing. *Commonwealth v. Freeman*, 150 A.3d 32, 43 (Pa.Super. 2016) (citations omitted) (concluding detention of over an hour was not unreasonable under the circumstances where troopers acted reasonably and diligently in pursuing their suspicions). *See also Commonwealth v. Prizzia*, 260 A.3d 263, 271-72 (Pa.Super. 2021) (distinguishing *Rodriguez, supra*). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Freeman, supra.*

To determine whether the officer had a reasonable suspicion, the court must consider the totality of the circumstances. Due weight must be given to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his or her experience. Finally, the totality of the circumstances test does not limit the court's inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Commonwealth v. Kemp*, 961 A.2d 1247, 1255 (Pa.Super. 2008) (*en banc*) (citing *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999)); *Galloway, supra* at 815 (citation omitted); *Harris, supra* at 1021 (citation omitted). The relevant inquiry is not an officer's subjective beliefs at any given time but the objective reasonableness of the search under the totality of the circumstances. *Commonwealth v. Watley*, 153 A.3d 1034, 1045

31

(Pa.Super. 2016) (citation omitted). Furthermore, initial cooperation with a law enforcement officer does not erase an otherwise valid belief that an occupant of a vehicle may have access to a weapon. *Id.* at 1045 n.9 (citation omitted).

Following the enactment of the Medical Marijuana Act ("MMA"), the Pennsylvania Supreme Court in *Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021), held that the smell of marijuana alone during a traffic stop is no longer sufficient to support a finding of probable cause to conduct the warrantless search of a vehicle. However, the Court also held that the smell may be considered a factor in examining the totality of the circumstances. *Commonwealth v. Lutz*, 270 A.3d 571, 578 (Pa.Super. 2022) (examining *Barr, supra*). The *Barr* Court also explained that the legal possession of marijuana, including the plant itself, required a patient's compliance with the dictates of the MMA. *Barr, supra* at 41. Failure to keep marijuana that has not been used in its original packaging is a violation under the MMA. *See* 35 P.S. § 10231.303(b)(6).

A warrantless search or seizure is presumptively unreasonable subject to a few long-established and well-delineated exceptions, including the exceptions of a *Terry* stop and frisk,[7] consent, and a search incident to arrest. *Lutz, supra* at 577 (citations omitted). *See also Commonwealth v. Santiago*, 768 MDA 2023, 2024 WL 1462304, at *4 (Pa.Super. Apr. 4, 2024) (citation

---

[7] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

omitted). Officers need not be absolutely certain that an individual is armed but, rather, the appropriate standard is whether a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger. *Interest of T.W.*, 261 A.3d 409, 417 (Pa. 2021) (analyzing *Terry*, 392 U.S. at 27, 88 S.Ct. 1868)). In conducting its review, a court also should contrast the heightened and inordinate risk of danger that law enforcement officers encounter during roadside encounters with the lesser expectation of privacy in a motor vehicle. *Commonwealth v. Boyd*, 17 A.3d 1274, 1278 (Pa.Super. 2011) (quoting *In re O.J., supra* at 565). *Accord Commonwealth v. Murray*, 936 A.2d 76, 79–80 (Pa.Super. 2007) (quoting *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997)) (articulating the danger in approaching a vehicle with tinted windows)).

Pennsylvania appellate courts have also previously defined the boundaries of a valid consent search. First, a defendant must have voluntarily given the consent during a lawful police interaction. *Commonwealth v. Valdivia*, 195 A.3d 855, 862 (Pa. 2018). The Commonwealth must demonstrate that the defendant's consent was "the product of an essentially free and unconstrained choice – not the result of duress or coercion, express or implied, or a will overborne – under the totality of the circumstances." *Id.* (citing *Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013)); *accord Commonwealth v. Fredrick*, 230 A.3d 1263, 1267 (Pa.Super. 2020) (citing same); *Kemp, supra* at 1261 (citation omitted).

Consent may be express or implied and "'voluntariness' is a question of fact to be determined from the totality of the circumstances." *Fredrick, supra.* (citations omitted). "[N]o one fact, circumstance, or element of the examination of a person's consent has talismanic significance." *Id.* (citing *Smith, supra* at 568-69). Additionally,

> while knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.... Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account....

> Since both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses.

*Kemp, supra* (quoting *Commonwealth v. Strickler*, 757 A.2d 884, 901-02 (Pa. 2000)). *Accord Commonwealth v. Carmenates*, 266 A.3d 1117, 1124 (Pa.Super. 2021) (*en banc*) (citing same).

If the defendant gave his or her consent voluntarily, then the ensuing search must be conducted within the scope of that consent. The standard for measuring the scope of an individual's consent is one of "objective reasonableness" based on "what ... the typical reasonable person would have understood by the exchange between the officer and the suspect." *Valdivia, supra* (citations omitted).

34

A warrantless arrest must be based on probable cause to be constitutionally valid. *Commonwealth v. Smith,* 979 A.2d 913, 916 (Pa.Super.2009) (citation omitted). In making the determination of whether probable cause for an arrest existed, the court is to view the totality of the circumstances from the vantage point of a prudent, reasonable, cautious law enforcement officer on the scene at the time of the arrest guided by his or her training and experience. *Commonwealth v. Goldman,* 252 A. 3d 668, 677-78 (Pa.Super.2021) (quotation omitted); Smith, supra (quoting *Commonwealth v. Dunlap,* 941 A.2d 671 (Pa. 2007). Flight alone does not constitute probable cause for an arrest. However, flight coupled with additional facts that point to guilt may establish probable cause to arrest. *Id.* At 916-17 (citations omitted)

Finally, the search incident to arrest exception allows arresting police officers to fully search the person incident to a lawful arrest. *Lutz, supra* at 580 (citations omitted). The search must be "substantially contemporaneous with the arrest and [is] confined to the immediate vicinity of the arrest." *Commonwealth v. Williams,* 305 A.3d 89, 97 (Pa.Super. 2023) (citation omitted).

As stated above, Appellant did not challenge the initial stop but, rather, contested the duration of the stop. Appellant asserts that the evidence obtained as a result of the vehicle stop should have been suppressed because Trooper Gilbert lacked reasonable suspicion to continue with an investigation outside of the reason for the initial stop. Moreover, Appellant maintains that

he did not voluntarily consent to a second frisk. As a result, Appellant sought the suppression of the evidence found on his person during the second search; specifically, the fentanyl recovered from his groin area, as well as all evidence recovered from the Honda Civic, including the cell phone and its contents.

After a thorough review of the totality of the circumstances, this court denied the motion for the reasons set forth in its Findings of Fact and Conclusions of Law as follows. In relevant part, Trooper Gilbert testified at the hearing that he conducted a vehicle stop of a red Honda Civic at 4:40 p.m. on January 26, 2022, in Montgomery County because the heavily tinted windows precluded him from being able to view any occupants inside the vehicle in violation of the Motor Vehicle Code.[8] Trooper Gilbert's first observations upon approaching the passenger's side of the vehicle were: 1) the strong odor of raw marijuana, 2) a fanny pack on the front-seat passenger's lap, which is commonly known to be used to store illegal narcotics or weapons based on his training and experience, 3) the passenger's legs and hands were shaking, and 4) the passenger was on a cell phone while talking with the Trooper and after the Trooper had asked him to end the call.

Trooper Gilbert was alone at this point in the interaction. Trooper Gilbert asked the driver to exit the vehicle so the Trooper could show him the reason for pulling him over. The Trooper performed a quick pat down of the

---

[8] Again, Appellant did not contest that Trooper Gilbert had probable cause to stop the vehicle for a Motor Vehicle Code violation at the Hearing.

36

outside of the driver's clothing for weapons as he does each time a person comes out of a vehicle for everyone's safety. Neither Appellant nor the driver could tell the Trooper from where in Philadelphia they were coming from even though they were visiting the driver's "sometimes" fiancé and were there to pick up items.

Appellant and his alleged co-conspirator were traveling from one source city (Philadelphia) to another source city (Lebanon). Even though Appellant was only a passenger and not the driver, Appellant still displayed excessive signs of nervousness, as did the driver. Trooper Gilbert conducted a check of the driver's information, which showed that he was driving with a suspended operator's license, and that he had a criminal history which included drug possession and a revoked gun permit. In addition, the driver told the Trooper that he had been arrested for simple assault.

Based on these indicators, this court concluded that Trooper Gilbert had reasonable suspicion to detain the driver and Appellant to continue his investigation. Trooper Gilbert returned to where the driver was standing and asked him if he had a medical marijuana card. Delvalle-Melendez produced a card as well as a sandwich baggie containing green leafy marijuana. The packaging was in violation of the Medical Marijuana Act.

Trooper Gilbert then went back to speak with Appellant, who was still on the cell phone despite being told to end the call. As with the driver, Appellant could not provide a more detailed description of where in

37

Philadelphia they had just visited. Moreover, Appellant was still very nervous and shaking. Once Trooper Gilbert learned that the vehicle belonged to Appellant's girlfriend, he found it odd that Delvalle-Melendez, who had a suspended license, was driving. The Trooper's concern was understandably heightened when he noticed that the fanny pack was no longer on Appellant's lap.

Trooper Gilbert and the driver then discussed Delvalle-Melendez's revoked gun permit and whether there were any weapons in the car, which Delvalle-Melendez denied. The driver unequivocally gave his consent for Trooper Gilbert to search the vehicle.

Trooper Gilbert then asked Appellant to exit the vehicle and explained that he would conduct a quick frisk for weapons. Appellant complied and voluntarily pulled out his pockets to show the Trooper that he did not have any weapons on him. The Trooper's cursory search of the vehicle revealed, among other things, that the fanny pack that Appellant had been holding on his lap when Trooper Gilbert first approached the vehicle was now tucked under the passenger seat, and empty. Trooper Gilbert testified that it made no sense to him that Appellant would be holding an empty bag on his lap.

Trooper Gilbert did not find any drug user paraphernalia located in the vehicle. Additionally, except for a flip phone that is the type of phone commonly used for the sale of illegal narcotics based on the Trooper's training and experience, there was nothing to support the driver's statement to the

Trooper that they had traveled to Philadelphia to pick up some items. When confronted with this information, Delvalle-Melendez replied that they had dropped items off at his girlfriend's, changing his original explanation for their trip.[9]

When asked what had been in the black fanny pack on Appellant's lap, Delvalle-Melendez replied, just trash. When asked the same question, Appellant replied that the fanny pack contained a blunt (a marijuana cigarette). Given that the fanny pack was empty, Trooper Gilbert reasonably suspected that one or both Appellant and Delvalle-Melendez had moved the contents of the bag onto their person or persons. Trooper Gilbert reasonably suspected one or both of them was concealing illegal narcotics or a firearm. This Court concluded that Trooper Gilbert possessed a reasonable suspicion that criminal activity was afoot to continue his investigation.

Delvalle-Melendez then consented to a more thorough search of his person than the earlier frisk for weapons. Trooper Gilbert did not find anything on Delvalle-Melendez's person other than the sandwich baggie containing marijuana that he had already produced. However, upon questioning of whether his passenger had anything illegal on him, Delvalle-Melendez broke eye contact and became a little more nervous than he had already been.

---

[9] The story changed again at trial, when Appellant testified that they went to meet the alleged "uncle" of Delvalle-Melendez to pick up car parts.

39

When Trooper Gilbert told Appellant that the fanny pack was empty and his suspicion that Appellant may be hiding something illegal on his person, Appellant voluntarily consented to a more thorough search of his person by stating "you can check me", twice. As soon as Trooper Gilbert hit the package in Appellant's groin area during the second search, Alvarez-Rodriguez attempted to flee.

At this point, based upon everything that had preceded this moment, the fluid nature of the events and the escalating levels of suspicion, the court opined that Trooper Gilbert had probable cause to arrest Appellant and Delvalle-Melendez and the search incident to that arrest was constitutionally valid. The investigation from the Trooper's first approach to the passenger side of the Honda Civic until the arrest of Appellant and Delvalle-Melendez lasted approximately thirty (30) minutes. This court found Trooper Gilbert's unrebutted testimony to be credible and afforded it significant weight based upon, *inter alia*, his relevant training and experience and his well-articulated reasoning. In addition to the Trooper's testimony, the Court viewed, listened to, and considered the dash camera video entered into the record.

After reviewing the totality of the circumstances that occurred during a swiftly developing situation, the court concluded that Trooper Gilbert diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly, during which time it was necessary to detain Appellant and the driver. The court found that the approximately thirty (30) minute

detention of Appellant was not unreasonable under the totality of the circumstances. Trooper Gilbert possessed reasonable suspicion, independent from his probable cause for the window-tint violation, and was justified in extending the duration of the traffic stop to further investigate his belief that criminal activity was afoot. The totality of the circumstances provided Trooper Gilbert and Trooper Ruiz with probable cause to arrest Appellant and his alleged co-conspirator Delvalle-Melendez, thereby validating Appellant's detention. Accordingly, Appellant's Motion to Suppress was without merit and this court properly denied it.

Appellant contends in his fourth appellate issue that the court and defense counsel erred in permitting Trooper Gilbert to offer expert opinion testimony, without being qualified as an expert, regarding fanny packs, Appellant's behavior,[10] and flip phones. Preliminarily, this issue is waived and, moreover, the claim is completely lacking in merit.

It is beyond cavil that an appellant waives any issue not preserved in pretrial motions, at trial, or in post-sentence motions, with very limited exception. *Commonwealth v. Hill*, 238 A.3d 399, 407 (Pa. 2020) (citing Pa.R.A.P. 302(a)); *Commonwealth v. Baumhammers*, 960 A.2d 59, 76 (Pa. 2008).

> Pennsylvania Rule of Appellate Procedure 302(a) provides that "[i]ssues not raised in the trial court are waived and cannot be

---

[10] Once again, Appellant has mischaracterized the evidence. When Trooper Gilbert testified that certain, specific, behavior was consistent with "possibly" being up to no good, he was describing Delvalle-Melendez's behavior, not Appellant's behavior. (N.T. Trial 5/1/23, at 50).

41

raised for the first time on appeal." Pa.R.A.P. 302(a). Likewise, we have long held that claims not raised before the trial court are waived. "It is well established that trial judges must be given an opportunity to correct errors at the time they are made. [A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected." *Commonwealth v. Strunk*, 953 A.2d 577, 579 (Pa.Super. 2008) (citations omitted). *See also Commonwealth v. Lopata*, 754 A.2d 685, 689 (Pa.Super. 2000) ("A claim which has not been raised before the trial court cannot be raised for the first time on appeal." (citation omitted)). "Even issues of constitutional dimension cannot be raised for the first time on appeal." *Strunk*, 953 at 579 (citation omitted).

*Commonwealth v. Spone*, 305 A.3d 602, 608–09 (Pa.Super. 2023).

Instantly, Attorney Jubelirer did not object to Trooper Gilbert's testimony on this basis either at the suppression hearing or at trial. Consequently, the issue is waived. Any contention that counsel was ineffective for failing to object on this basis is premature. Moreover, the claim is disingenuous at best.

A law enforcement officer testifying about his observations and conclusions in the performance of his duties related to the matter before the court is typically not offered as an expert witness. In this case, the Commonwealth presented Trooper Gilbert as a fact witness in support of his decisions to investigate and eventually arrest Appellant based upon probable cause to do so. As previously stated, a probable cause determination requires a totality of the circumstances review from the vantage point of a prudent, reasonable, cautious law enforcement officer on the scene at the time guided by his or her training and experience. When testifying about his observations and conclusions now belatedly objected to on appeal, Trooper Gilbert

42

explained that in the performance of his duties that day, he specifically relied on his training and experience to arrive at those conclusions. Accordingly, Appellant's fourth issue is completely devoid of merit.

In his fifth issue on appeal, Appellant challenges the court's denial of his request for an instruction on duress. At trial, Attorney Jubelirer argued that it was not up to the court to decide whether or not to grant the request, but that Appellant's testimony that he felt pressured was enough to mandate the instruction be given. Appellant is mistaken.

The defense of duress is codified in the Crimes Code as follows:

**(a) General rule.**--It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
**(b) Exception.**--The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

18 Pa.C.S.A. § 309. The United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Commonwealth v. Markman*, 916 A.2d 586, 607 (Pa. 2007) (citation omitted).

Hence, "[w]here a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record," *DeMarco*, 570 Pa. at 271, 809 A.2d at 261; it is "for the trier of fact to pass upon that evidence and improper for the trial judge to exclude such consideration by refusing the charge." *Commonwealth v. Lightfoot*, 538 Pa. 350, 355, 648 A.2d 761, 764 (1994) (internal quotation marks omitted); *see also*

43

*Commonwealth v. Borgella*, 531 Pa. 139, 142, 611 A.2d 699, 700 (1992) ("A defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and **for which there exists evidence sufficient for a reasonable jury to find in his or her favor.**"); *Commonwealth v. Weiskerger*, 520 Pa. 305, 312-13, 554 A.2d 10, 14 (1989) (same). In determining whether there is sufficient evidentiary support for a duress instruction, the trial court considers all evidence presented, whether adduced by the defendant as part of her case in chief, through cross-examination, or, "conceivably ... in the Commonwealth's own case in chief." *DeMarco*, 570 Pa. at 271 n. 6, 809 A.2d at 261 n. 6 (internal quotation marks omitted).

*Id.* (emphasis added).

The appellate court's standard of review when considering a trial court's denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law. *Commonwealth v. Galvin*, 985 A.2d 783, 797–99 (Pa. 2009) (citing *Commonwealth v. DeMarco*, 809 A.2d 256, 260–61 (Pa. 2002)).

Here, Appellant did not present sufficient evidentiary support for a reasonable jury to find in his favor, which would have entitled him to the instruction. First, Appellant presented nothing to support his claim of duress with the exception of his own self-serving statements. Those statements did not provide evidence of duress based on the claimed threats allegedly made by Delvalle-Melendez. For example, the threat Appellant testified about that Delvalle-Melendez would kill him "**if** they took his son" is markedly different from the threat contained in Appellant's concise statement that Delvalle-Melendez would kill him "if he did not conceal [the drugs]". The threat

44

Appellant claimed at trial that Delvalle-Melendez made was conditioned on a future event which may or may not occur and, therefore, was not enough to support a jury charge on duress. Notably, there is nothing in the exchange between Appellant and Delvalle-Melendez captured on video that is evidence of duress, nor were any of those statements proffered as evidence thereof. Appellant also testified that Delvalle-Melendez put pressure on him and that he told Trooper Gilbert that Delvalle-Melendez was intimidating him. Even in combination with Appellant's repeated claim that Delvalle-Melendez threw the drugs at him, this too was insufficient to warrant an instruction on duress under the law.

In contrast, in *Markman, supra,* the appellant's trial testimony provided evidence that her co-defendant "repeatedly battered her and placed a knife to her throat or side and threatened her with death if she did not do as he instructed." *Id.* at 607. These claims were corroborated to some degree by a neighbor and consistent with the testimony of two other witnesses. *Id.* at 608. The Pennsylvania Supreme Court concluded that this evidence was sufficient to raise a question of fact concerning whether the appellant had been subjected to duress and, thus, entitled to a jury instruction under Section 309. *Id.*

In *DeMarco, supra,* the appellant sought a duress jury instruction when he was on trial for perjury, based on the false statements he had made in another case but later recanted. The earlier case based on claims of terroristic

45

threats against a third person was initiated by the boyfriend, Larwa, of the appellant's sister, whose house the appellant was residing in at the time. At his perjury trial, the appellant argued that his corroboration of the facts alleged by Larwa had been made under duress. The Pennsylvania Supreme Court found the following evidence presented at trial clearly sufficient to send the question for the jury to consider:

> Larwa shot him with a B.B. Gun, choked him, and threatened to deprive him of his social security checks or kill him if he did not corroborate Larwa's account of how his cars came to be damaged. Appellant also presented evidence of his situation when the threats occurred, including that he: (1) suffers from seizures, (2) is borderline mentally retarded with a third grade intellectual level, (3) receives social security because he is mentally disabled, and (4) was living with Larwa without transportation or sufficient money to move to alternative housing.

*Id.* at 263. Moreover, at the appellant's perjury trial, the appellant's wife testified that she was living at Larwa's home with the appellant when Larwa coerced him into falsely accusing Zarcone of damaging the cars. According to this witness, she **heard** Larwa telling the appellant what he should say in court and threatening to either kill the appellant or take away his social security checks if he did not testify as rehearsed. *Id.* at 259 (emphasis added). Finally, the appellant's mother also testified that she had gone to Philadelphia police to report Larwa's threats to no avail. *Id.*

In *Commonwealth v. Kyslinger*, cited by Appellant, the Pennsylvania Supreme Court found that the appellant offered **sufficient** evidence of coercion as to have entitled him to have had the issue of duress placed before

46

the jury, so as to permit the jury to determine whether the alleged coercion was of sufficient magnitude as to relieve the appellant of culpability for his actions. 484 A.2d 389, 391 (Pa. 1984). Specifically,

> [t]he record discloses that Mr. Lane, the operator of the company to which appellant's debt was owed, and two of his associates traveled from Kentucky to appellant's office in Pittsburgh where, for approximately *two hours*, they *repeatedly "demanded" immediate* payment for two barge loads of coal that they had shipped to appellant. Appellant insisted that he did not have funds available to make payment and that, notwithstanding, payment was conditioned upon acceptance by U.S. Steel, for whom the shipment was ultimately intended, a fact known to the parties when the contract was formed. One of Mr. Lane's associates warned appellant that they planned to spend the night in Pittsburgh but that *"if we go home, you're going with us."* Hence, appellant was threatened with being taken, against his will, to Kentucky, if demands for immediate payment were not met. The implications of being transported, unwillingly, to Kentucky, for an unstated purpose, could reasonably have instilled fear in appellant, causing him to issue the check as a means of avoiding harm that might await him in Kentucky.

*Id.*

In the case at bar, Appellant's uncorroborated, self-serving claims that Delvalle-Melendez threw the drugs at him, told him to put them in his pants, and told him that Delvalle-Melendez would kill him "if they took away [Delvalle-Melendez's] son" were insufficient to support a jury instruction on duress under Section 309. Instead, this court permitted Attorney Jubelirer to argue the evidence of record that Appellant acted in fear. The court properly exercised its discretion and did not err in denying Appellant's request for a duress jury instruction.

47

Next Appellant complains that the court erred in sustaining the Commonwealth's objections to testimony by Ms. Davila stating what Appellant said to her on the phone during the police stop because it was a prior consistent statement under Pa.R.E. 613(d) [sic];[11] a present sense impression, an excited utterance, and state of mind exception supporting Appellant's defense of duress. The court neither erred nor abused its discretion.

Assuming that Appellant is relying on Rule 613(c), Appellant is still mistaken. Rule 613 provides in part as follows:

> **(c) Witness's Prior Consistent Statement to Rehabilitate.** Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
>
> (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
>
> (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c).

As explained the comment section to the rule, this particular section may be used to rehabilitate a witness where there has been an attempt to impeach his credibility. It may not be used to bolster his or her testimony.

---

[11] The court believes this is a typo as Rule 613(d) does not exist.

48

The well-settled law in Pennsylvania regarding the admissibility of a witness's prior consistent statements states as follows:

> Because such statements are hearsay, their use as a means to rehabilitate the credibility of an impeached witness' testimony is severely limited; and such statements are admissible only if it is alleged that the witness' present testimony is recently fabricated or a result of corrupt motives. Furthermore, evidence of such statements is "admissible only in rebuttal and then only for the purpose of showing that that which the witness now testifies to has not been recently fabricated". As a further restriction upon admissibility the statement must have been made at a time "before its ultimate effect on the question trying could have been foreseen". In more recent times this court has interpreted this caveat to mean before "any corrupt motive has arisen".
>
> If one testifies that they did a certain thing at a given time, they may be challenged that they said something different before. Such is impeachment by a prior contradictory statement. Ordinarily, that one has always said the same thing is subsumed in their testimony and need not be buttressed by evidence of prior consistency, unless that consistency, by allegation of recent fabrication is challenged. When challenged, evidence of prior and continued consistency may be offered. Evidence of prior consistency, absent such challenge is not required and is essentially cumulative and repetitious. To regularly allow testimony of prior consistency may easily become a device to merely augment the credibility of witnesses by others.
>
> "The admission of such consonant statements is a matter to be decided by the trial judge in the exercise of his discretion in light of the character and degree of impeachment."

*Commonwealth v. Jubilee,* 596–98, 589 A.2d 1112, 1115–16 (Pa.Super. 1991) (internal citations omitted) (emphasis added).

At no time did Appellant claim that he told Trooper Gilbert that Delvalle-Melendez had threatened his life. Rather, his testimony at trial was that he told the Trooper numerous times that the drugs were not his, that he did not

49

know about them, and that Delvalle-Melendez had thrown them at him upon sighting the Trooper behind them. Trooper Gilbert confirmed Appellant's testimony as what he had been told, and the jury observed the video and heard the exchange between Appellant and Delvalle-Melendez. The court permitted Ms. Davila to testify regarding her observations of Appellant on FaceTime as being nervous and scared. Of note, compared to cases cited above, Appellant did not offer Ms. Davila to testify that she had heard Delvalle-Melendez's alleged threats. Rather, the offer was to repeat what Appellant had said to her consistent with his trial testimony. The court properly exercised its discretion in sustaining the Commonwealth's objection to that portion of Ms. Davila's testimony and the claim is unavailing.

In issues seven (7) through ten (10) on appeal, Appellant challenges the court's sentence as being excessive and unduly harsh given the facts of the case, his character and his role in the offense. Appellant also insists the court abused its discretion by not "adequately" considering a myriad of factors. Appellant's assertions lack merit for the reasons set forth below.

Now long settled, the Pennsylvania Supreme Court has outlined a two-part duty for sentencing judges as follows:

> The first responsibility is a fact-finding responsibility: the judge must be sure he [or she] had enough information. The second responsibility is an application-and-explanation responsibility: the judge must apply to the information he [or she] has gathered the guidelines specified in the Sentencing Code, 42 Pa.C.S. §§ 9701 *et seq.*, and explain how the sentence he [or she] has selected is responsive to, and reflects the standards embodied in, those guidelines.

50

*Commonwealth v. Luketic*, 162 A.3d 1149, 1161 (Pa.Super. 2017) (quoting *Commonwealth v. Devers*, 546 A.2d 12, 16 (Pa. 1988)).

A sentencing court has broad discretion in fashioning a sentence because the court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Goodco Mechanical, Inc.*, 291 A.3d 378, 405 (Pa.Super. 2023) (citation omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* (citation omitted). *Accord Commonwealth v. Walker*, 305 A.3d 12, 20 (Pa.Super. 2023) (citation omitted).

> In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Bankes*, 286 A.3d 1302, 1307 (Pa.Super. 2022). *Accord Commonwealth v. Morgan*, 258 A.3d 1147, 1157 (Pa.Super. 2021) (citation omitted).

Indeed, as the Pennsylvania Supreme Court has explained, there are "significant policy reasons underpinning this deferential standard of review":

> Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult

51

to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

*Commonwealth v. Perry*, 32 A.3d 232, 236-37 (Pa. 2011) (quoting *Commonwealth v. Walls*, 926 A.2d 957, 961-62 (Pa. 2007)).

"One of the fundamental norms" is that a sentence be individualized. *Luketic, supra* at 1160.

> The Sentencing Code prescribes individualized sentencing by requiring the sentencing court to consider the protection of the public, the gravity of the offense in relation to its impact on the victim and the community, and the rehabilitative needs of the defendant, and prohibiting a sentence of total confinement without consideration of "the nature and circumstances of the crime[,] and the history, character, and condition of the defendant".

*Id.* at 1161 (citations omitted). *Accord Commonwealth v. Velez*, 273 A.3d 6, 9 (Pa.Super. 2022) (citations omitted). The balancing of these sentencing factors is solely within the sentencing court's province. *Id.* at 10 (citation omitted). "Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the 'minimum possible' confinement." *Commonwealth v. Davis*, 241 A.3d 1160, 1178 (Pa.Super. 2020) (citing *Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa.Super. 2010)).

In determining the sentence to be imposed, the Sentencing Code mandates that the trial court also consider the sentencing guidelines. *Goodco*

*Mechanical, supra* at 406 (citations omitted). "However, the sentencing guidelines are purely advisory in nature – they are not mandatory." *Velez, supra* at 10 (citation omitted). The court may use its discretion and sentence outside of the guidelines, as long as the sentence imposed does not exceed the maximum sentence allowed by statute, and the court places its reasons for doing so on the record. *Id.; accord Commonwealth v. Snyder*, 289 A.3d 1121, 1127 (Pa.Super. 2023) (citation omitted). Appellate courts will be guided by the considerations listed in 42 Pa.C.S.A. § 9781 and whether the sentencing court properly considered the factors set forth in 42 Pa.C.S.A. § 9721(b). *Velez, supra* at 12 (citing *Walls, supra*).

Moreover, the Code requires the court to state its reasons for the sentence in open court at the time of sentencing. The court may meet this requirement by stating that it has read the presentence report and, therefore, has properly considered and weighed all relevant factors. *Goodco Mechanical, supra* at 407 (citations omitted). *Accord Snyder, supra* at 1126 (citation omitted). The sentencing court must assess the case in an impartial manner, free of personal bias or interest in the outcome. *Goodco Mechanical, supra* at 410 (citations omitted).

Finally, if "a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." *Commonwealth v. Hill*, 210 A.3d 1104, 1117 (Pa.Super. 2019) (citation omitted). Where the combination of both a PSI report and a standard range

53

sentence exist, the sentence cannot be considered excessive or unreasonable absent some indicia clearly evidencing the contrary. *Id.*; *Moury*, 992 A.2d at 171 (citation omitted).

Instantly, Appellant presents a multi-prong argument regarding his sentence that can be reduced to three complaints as follows: 1) the court abused its discretion and imposed an excessive and unreasonable sentence by sentencing Appellant at the top of the standard range;[12] 2) the court failed to "adequately" consider the factors as prescribed by the Sentencing Code,[13] and 3) the court's sentence was excessive and unduly harsh given, *inter alia*, the sentencing guidelines; the facts of the case, and Appellant's character and role in the offense. As they all pertain to his sentence, the court will address these claims together.[14]

First, as the court stated at sentencing, the undersigned had read the presentence report and, therefore, it can be assumed that the court properly considered and weighed all relevant factors. Regardless, the court also set forth all of the information it had reviewed in detail, including the PSI report, the PPI evaluation report, the sentencing guidelines, the letters received in support of Appellant, the sentencing statute, the issues of general and specific

---

[12] In actuality, the court sentenced Appellant in the mitigated range on the conviction for criminal conspiracy and in the aggravated range on his conviction for resisting arrest.

[13] Appellant does not define the term "adequately" or cite to the record.

[14] Appellant's eighth claim that he has presented a substantial question is for the appellate court to determine.

54

deterrence, the amount of fentanyl recovered from inside of Appellant's pants and the danger it posed to thousands of people, Appellant's criminal history including prior convictions for possession with intent to deliver controlled substances and resisting arrest, his multiple probation and parole violations, multiple misconducts while incarcerated, and the danger he placed Trooper Gilbert in by resisting arrest next to the highway with cars speeding past during rush hour. The Commonwealth requested a standard range sentence of seven and a half (7 ½) to fifteen (15) years on the conspiracy conviction and an aggravated range sentence of nine (9) months on the resisting arrest conviction. Appellant received an aggregate sentence of six (6) to twelve (12) years.

The court exercised its discretion in fashioning a sentence based on all of the information it had gathered. The court placed its reasons for the sentence on the record. Appellant has not established by reference to the record that this court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. Hence, these claims warrant no relief.

In his final issue on appeal, Appellant contends that the court erred in denying Appellant's oral motion for judgment of acquittal at the close of the Commonwealth's case. The court disagrees.

The Pennsylvania Rules of Criminal Procedure provide that a defendant may challenge the sufficiency of the evidence to sustain a conviction by

arguing a motion for judgment of acquittal at the close of the Commonwealth's case-in-chief. *Commonwealth v. Powanda*, 304 A.3d 1284, 1288 (Pa.Super. 2023) (citing Pa.R.Crim.P. 606(A)(1)).

> The test for ruling upon a motion for judgment of acquittal is whether the prosecution's evidence, and all inferences arising therefrom, considered in the light most favorable to the prosecution are insufficient to prove beyond a reasonable doubt that the accused is guilty of the crimes charged.

*Id.* (citation omitted). *See also Commonwealth v. Sunealitis*, 153 A.3d 414, 420 (Pa.Super. 2016) ("A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.").

On review, the appellate court will evaluate whether there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt viewing all of the evidence admitted at trial in the light most favorable to the verdict winner and may not substitute its own judgment for that of the fact-finder. *Id.* (citing *Commonwealth v. Stiles*, 143 A.3d 968, 981 (Pa.Super. 2016)).

The criminal statute provides that a person commits resisting arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S.A. § 5104.

56

"Section 5104 does not require evidence of serious bodily injury, nor does it require actual injury. Merely exposing another to the risk of such injury is sufficient to sustain a conviction". *Commonwealth v. Moffitt*, 305 A.3d 1095, 1102 (Pa.Super. 2023) (citation omitted).

Instantly, in consideration of all of the circumstances leading up to this point, Trooper Gilbert was performing a consensual search of Appellant when the Trooper felt what he described as narcotics packaging in the groin area of Appellant's pants. Once the Trooper felt and heard the sound of plastic packaging in Appellant's pants, Appellant attempted to break away from him. The camera video evidence and Trooper Gilbert's testimony made it clear that Appellant was trying to pull away from the Trooper such that Trooper Gilbert believed it necessary to take him to the ground to prevent Appellant from fleeing. Appellant then continued to resist to the point where the pair were wrestling on the ground right next to Interstate 76 during rush hour until Trooper Ruiz was able to assist with putting Appellant in handcuffs. This court properly determined that the evidence could support a finding of guilty beyond a reasonable doubt for resisting arrest and sent Count 4 to the jury.

The Controlled Substance, Drug, Device and Cosmetic Act prohibits "[t]he use of, or possession with intent to use, drug paraphernalia for the purpose of planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packing, repacking, storing, containing, concealing,

injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act." 35 P.S. § 780-113(a)(32). Otherwise mundane packaging materials can constitute paraphernalia where the Commonwealth establishes that such materials were used or intended to be used with a controlled substance. *Commonwealth v. White-Ashe*, 252 A.3d 244, 2021 WL 796675 at *7 (Pa.Super. March 2, 2021) (citing *Commonwealth v. Torres*, 617 A.2d 812, 815 (Pa.Super. 1992)).

Here, the Commonwealth introduced evidence of one larger plastic bag containing two (2) sandwich bags holding about 192 grams of fentanyl taken from inside of Appellant's pants, which was sufficient to support a support a finding of guilty beyond a reasonable doubt for drug paraphernalia, and the court properly sent Count 3 to the jury.

Finally, Appellant claims that the Commonwealth failed to produce sufficient evidence for the count of criminal conspiracy to possess with intent to deliver to go to the jury. Again, Appellant is mistaken.

Pennsylvania law provides that

> a person commits criminal conspiracy with another person or persons if, "with the intent of promoting or facilitating [a crime's] commission he ... agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." 18 Pa.C.S.A. § 903(a). The essence of a criminal conspiracy is a common understanding or agreement that a particular criminal objective be accomplished. *See Commonwealth v. Munson*, 261 A.3d 530, 542 (Pa.Super. 2021).

> Circumstantial evidence may provide proof of the conspiracy. The conduct of the parties and the circumstances

58

surrounding such conduct may create a "web of evidence" linking the accused to the alleged conspiracy beyond a reasonable doubt. Additionally:

> An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*[Commonwealth v. ]Perez*, 931 A.2d [703, 708 (Pa.Super. 2007)].

*Commonwealth v. Winston*, 301 A.3d 870 (Pa.Super. 2023), *appeal denied*, 306 A.3d 257 (Pa. 2023). *Accord Commonwealth v. Irvin*, 134 A.3d 67, 76 (Pa.Super. 2016) (citing same).

Instantly, the Commonwealth presented evidence in their case-in-chief which included Appellant's overt act of the possession of 192 grams of fentanyl packaged in plastic wrap and baggies and stuffed in the groin area of his pants. Other evidence included the fanny pack on Appellant's lap when Trooper Gilbert first approached the Honda Civic that disappeared while the Trooper was speaking with the driver outside of the vehicle, as well as Appellant's nervousness, the discrepancies in his version of what was in the fanny pack compared to the driver's version, and the fact that it was empty when Trooper Gilbert looked inside. Trooper Gilbert also testified that he did not find any drug user paraphernalia inside of the Honda, indicating that the fentanyl in Appellant's possession was for distribution and not personal use.

Hence, the court did not err in denying Appellant's motion and properly sent Count 5 to the jury for their consideration.

Accordingly, Appellant's claims on appeal warrant no relief.

## V. CONCLUSION

Based upon the foregoing analysis, this court respectfully requests that the Superior Court affirm Appellant's judgment of sentence.

**BY THE COURT:**

**THOMAS P. ROGERS, J.**
**Court Of Common Pleas**
**Montgomery County, Pennsylvania**
**38th Judicial District**

Copies sent on June 20, 2024
**By E-Mail to:**
Deputy District Attorney Robert M. Falin
Michael N. Huff, Esquire, Office of the Montgomery County Public Defender,
    Counsel for Appellant

Judicial Assistant